NO. 22-35192

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Randey Thompson,

*Plaintiff-Appellee,*

v.

Ben Small, Keith Clark, Tom Dingus, Debra Long, Cynthia McMullen, and
Mysti Reneau,

*Defendant-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
No. 2:21-cv-00252-SAB
Honorable Stanley A. Bastian

**OPENING BRIEF OF APPELLENTS**

Michael E. McFarland, Jr., WSBA #23000
Rachel K. Platin, WSBA #58280
Evans, Craven & Lackie, P.S.
818 West Riverside, Suite 250
Spokane, Washington 99201
Telephone: (509) 455-5200
*Attorneys for Appellants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………iv

I.    ISSUES PRESENTED FOR REVIEW …………………………………1

II.    STATEMENT OF JURISDICTION ...……………………………………...3

III.    SUMMARY OF ARGUMENT …………………………………………..4

IV.    STATEMENT OF FACTS …………………………………………...10

    A. Mr. Thompson's Facebook Post …………………………………..10

    B. Investigation into Mr. Thompson's Conduct ……………………...11

    C. Impact Interviews …………………………………………………13

    D. September 22, 2020 Notice and Opportunity Meeting ……………15

    E. Alleged Hacking and Subsequent Investigation …………………..16

    F. Voluntary Transfer Agreement ……………………………………18

    G. May 6, 2021 Notice and Opportunity Meeting ……………………18

    H. Notice of Transfer to Subordinate Position ………………………19

V.    ARGUMENT AND ANALYSIS ……………………………………….22

    A. Standard of Review ………………………………………………..22

    B. Appellants are Entitled to Qualified Immunity……………………23

        1. Mr. Thompson did not Suffer a Constitutional Violation …..24

            a. Mr. Thompson did not Speak on a Matter of Public Concern when he Referred to Students in a Derogatory Manner and was Dishonest to the School Board………………………..………………….…...26

ii

      b. Mr. Thompson Spoke as a Public Employee as his Inappropriate, Derogatory and Dishonest Comments Were Made at School, Within the Course of his Employment. …………………………………………..28

      c. Mr. Thompson's Transfer to a Teaching Position was not Motivated by any Protected First Amendment Speech. …………………………………………...29

      d. CVSD Had an Adequate Justification for the Transfer……………………………………...…..31

   2. Appellants Are Entitled to Qualified Immunity Because They Acted Reasonably at All Times …………..35

      a. Superintendent Small Acted Reasonably at All Times…………………………………………...37

      b. The School Board Members Acted Reasonably at All Times…………………………………………...43

VI.   CONCLUSION ……………………………………………46

## **Table of Authorities**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................... 22

*Ashcroft v. Al-Kidd*,
  563 U.S. 731 (2011) ...................................................................... 23

*Baker v. Rancansky*,
  887 F.2d 183 (9th Cir. 1989) ........................................................ 23

*Bennett v. Metro Gov't of Nashville & Davidson Cty.*,
  977 F.3d 530 (6th Cir. 2020) ........................................................ 26

*Brewster v. Bd. of Educ.*,
  149 F.3d 971 (9th Cir. 1998) .......................................... 26, 32, 35

*Brosseau v. Haugen*,
  543 U.S. 194 (2004) ...................................................................... 23

*Cantwell v. Conn.*,
  310 U.S. 296 (1940) ...................................................................... 26

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................... 22

*Chandler v. McMinnville Sch. Dist.*,
  978 F.2d 524 (9th Cir. 1992) ........................................................ 42

*Clairmont v. Sound Mental Health*,
  632 F.3d 1091 (9th Cir. 2011) ...................................................... 35

*Coomes v. Edmonds School District No. 15*,
  816 F.3d 1255 (9th Cir. 2016) ...................................................... 28

*Eng v. Cooley*,
  552 F.3d 1062 (9th Cir. 2009) ................................................ 25, 35

*Estate of Anderson v. March*,
  985 F.3d 726 (9th Cir. 2021) .......................................................... 3

*F.E. Trotter, Inc. v. Watkins*,
  869 F.2d 1312 (9th Cir. 1989) ................................................. 22-23

iv

*Foster v. City of Indio*,
   908 F.3d 1204 (9th Cir. 2018) .......................................................... 3

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ...................................................................... 28

*George v. Morris*,
   736 F.3d 829 (9th Cir. 2013) .................... 3, 11, 12, 13, 14, 15, 16, 17, 18, 19

*Gilbrook v. City of Westminster*,
   177 F.3d 839 (9th Cir. 1999) ................................................. 34, 36

*Glover v. Daniel*,
   318 F. Supp. 1070 (N.D. Ga. 1969) .............................................. 43

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ...................................................................... 32

*Hyland v. Wonder*,
   972 F.2d 1129 (9th Cir. 1992) ...................................................... 43

*Isayeva v. Sacramento Sheriff's Dep't*,
   872 F.3d 938 (9th Cir. 2017) ........................................................ 35

*Johnson v. Multnomah County*,
   48 F.3d 420 (9th Cir. 1993) ..................................................... 25-26

*Malley v. Briggs*,
   475 U.S. 335 (1986) ...................................................................... 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...................................................................... 22

*Moonin v. Nev. Ex rel. Its Dep't of Pub. Safety Highway Patrol*,
   960 F. Supp. 2d 1130 (D. Nev. 2013) ...................................... 36-37

*Moran v. State of Wash.*,
   147 F.3d 839 (9th Cir. 1998) ........................................................ 36

*Mukherjee v. Immigration & Naturalization Service*,
   793 F.2d 1006 (9th Cir. 1986) ...................................................... 21

v

*Noel v. Andrus*,
   810 F.2d 1388 (5th Cir. 1987) ........................................................ 27

*Pickering v. Bd. of Educ.*,
   391 U.S. 563 (1968) .................................................................... 31

*Plumhoff v. Rickard*,
   134 S. Ct. 2012 (2014) ................................................................ 23

*Rankin v. McPherson*,
   438 U.S. 378 (1987) ............................................................... 31, 43

*Rivas-Villegas v. Cortesluna*,
   142 S. Ct. 4 (2021) ..................................................................... 23

*Roe v. City & County of San Francisco*,
   109 F.3d 578 (9th Cir. 1997) ....................................................... 26

*Saucier v. Katz*,
   533 U.S. 194 (2001) .................................................................... 23

*Shafer v. Cnty. Of Santa Barbara*,
   868 F.3d 1110 (9th Cir. 2017) ..................................................... 36

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ....................................................... 22

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) .................................................................... 31

*Warren v. Warrior Golf Capital, LLC*,
   126 F. Supp. 3d 988 (E.D. Tenn. 2015) ...................................... 26

*Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
   591 F. Supp. 2d 511 (S.D.N.Y. 2008) ......................................... 32

*West v. Atkins*,
   487 U.S. 42 (1988) ..................................................................... 24

## STATUTES

28 U.S.C. § 1291 ................................................................................. 3

42 U.S.C. § 1983 ............................................................................... 24

RCW 28A.320.010 ............................................................................ 43

RCW 28A.405.230 ......................................................... 19, 20, 21, 43

124 Stat. 2643 ……………………………………………………… 38

## FEDERAL RULES

Fed. R. Civ. P. 56 ............................................................................ 22

## I. ISSUES PRESENTED FOR REVIEW

Appellants Ben Small, Debra Long, Mysti Reneau, Keith Clark, Tom Dingus and Cynthia McMullen (together "Appellants"), submit that this review involves the following issues:

**ISSUE NO. 1:** Are school board directors and school administrators permitted to remove a school administrator from his administrative position without violating his Constitutional rights based upon the administrator's dishonesty to the school board during the course of his employment?

**BRIEF ANSWER**: Yes. Appellee Randey Thompson's repeated dishonesty to CVSD Administration and then the School Board caused Appellants to question his fitness to hold an important leadership position within CVSD and dishonesty is not a constitutionally-protected right under the First Amendment.

**ISSUE NO. 2**: Is it reasonable for school administrators to believe that a public middle school assistant principal does not have a constitutional right to espouse demeaning and derogatory commentary about students during school hours and in the course of his employment?

**BRIEF ANSWER**: Yes. Mr. Thompson's history of making degrading, disability and racially-insensitive comments to and in front of students

1

and staff members is not constitutionally protected speech that precludes school district administrators from addressing such conduct.

**ISSUE NO. 3**: Is it reasonable for school administrators and board members to conduct a *Pickering* balancing analysis to determine that derogatory speech and dishonesty constitutionally authorizes the transfer of an administrator to a teaching position?

**BRIEF ANSWER**: Yes. Prior to transferring Mr. Thompson to a teaching position, Appellants conducted a thorough *Pickering* balancing analysis, taking into account the public versus private nature of Mr. Thompson's speech, as well as the forum in which the speech occurred and the likelihood of disruption to the school environment.

**ISSUE NO. 4**: Is it reasonable for a school administrator to place an assistant principal on paid administrative leave to investigate concerns brought by other teachers about the assistant principal's use of the word "Demtard" in a Facebook post?

**BRIEF ANSWER**: Yes. The term "tard" is derogatory, demeaning and offensive to the many special needs students, and their families, served by CVSD. An assistant principal's use of that term is potentially harmful to CVSD's relationship with its students and families, as well as harmful to students

2

themselves. Therefore, upon receipt of complaints that Mr. Thompson, who held a leadership position in CVSD, had publicly used the term "Demtard," it was eminently and constitutionally reasonable for CVSD Superintendent Ben Small to place Mr. Thompson on paid administrative leave while CVSD investigated the extent of the dissemination of the post, as well as whether Mr. Thompson had made the same or similar comments in other contexts, and in particular around or to students of CVSD.

## I. STATEMENT OF JURISDICTION

An order denying a motion for summary judgment is usually not an immediately appealable final decision. 28 U.S.C. § 1291. However, this general rule does not apply when the summary judgment motion is based on a claim of qualified immunity, because pretrial orders denying qualified immunity generally fall within the collateral order doctrine. *Estate of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 771-72 (2014)). This Court's interlocutory review jurisdiction is limited to resolving a public official's "purely legal … contention that [his or her conduct] 'did not violate the [Constitution] and, in any event, did not violate clearly established law.'" *Id.; see also Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018); *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

3

## II.   SUMMARY OF ARGUMENT

In August 2020, Central Valley School District Superintendent Ben Small learned that Randey Thompson, an assistant principal in the Central Valley School District ("CVSD"), had posted a message on Facebook that included the term "Demtard." He used the term "hateful racist bitch." He wrote that if Americans did not take their heads out of their asses, he and the other like-minded individuals would take them "to the woodshed for a proper education." Superintendent Small was particularly concerned about Mr. Thompson's use of the term "tard," as that term is offensive, degrading, insulting and harmful to the special needs students, and their families, served by CVSD.  At the time he became aware of the Facebook post, Superintendent Small did not know how far and wide Mr. Thompson's post had been disseminated. He did not know, for example, whether the post had been seen by students, parents or CVSD staff (other than the staff who reported it to him). Superintendent Small likewise did not know whether Mr. Thompson had used that term in other contexts, including to and in front of students. Superintendent Small therefore placed Mr. Thompson on paid administrative leave pending an investigation into those issues.

During the ensuing investigation, Superintendent Small came to learn that Mr. Thompson often used the term "short bus" at school when discussing special

needs students and referred to Washington Governor Jay Inslee as "Governor Short Bus." This too caused Superintendent Small concern, as the term "short bus" has become an insult and derogatory slang term used as a means of attacking someone's intelligence, and its use is demeaning and harmful to special needs students. This is true even if students do not hear Mr. Thompson using the term, as the term stigmatizes special needs students and perpetuates potential discrimination they face by characterizing them as something less or unequal to general education students. Use of the term tells others that it is okay to demean, taunt, bully and disrespect students who ride the "short bus." When that message is being perpetuated by an administrator whose job it is to protect the school's most vulnerable students, that presents a grave concern for CVSD.

Superintendent Small also learned during the investigation that Mr. Thompson gave a presentation at school in which he used the demeaning and derogatory characterizations of student as "Tide Pod Challenge kids" and "snowflakes." The investigation also revealed that while participating in a focus group looking at concerns raised by Black students, Mr. Thompson asked a Black student whether he believed he was treated differently than the "normal" students. Finally, Mr. Thompson was not only uncooperative during the investigation, but

it was established that he was outright dishonest when he claimed to his supervisors (and later to the Board) that his Facebook page had been "hacked."

Based upon the totality of the foregoing, Superintendent Small recommended that Mr. Thompson be transferred to a teaching position. The Board subsequently upheld that decision.

Mr. Thompson will argue that this case is about a public school employee's First Amendment right to free speech on his own Facebook page. It is not. While the Facebook post alone may or may not have given CVSD the right to transfer Mr. Thompson to a teaching position, the same is immaterial, as it is undisputed that Superintendent Small's decision, and the Board's affirmation of that decision, were based upon the totality of information learned during the investigation. It simply cannot be argued that Mr. Thompson's use of terms at school that are demeaning, derogatory and harmful to students, or that his dishonesty to his supervisors and the Board, are protected by the First Amendment. That is important because the decision to transfer Mr. Thompson to a teaching position would have been made even if the Facebook post was not considered. As such, even if the Facebook post is constitutionally-protected, Superintendent Small did not violate the First Amendment in deciding to transfer Mr. Thompson to a

teaching position, and the Board members likewise did not deprive Mr. Thompson of his First Amendment right in affirming Superintendent Small's decision.

In denying qualified immunity to Appellants, the district court failed to recognize that Mr. Thompson's transfer to a teaching position was based upon conduct wholly unrelated to the Facebook post, and clearly not protected by the First Amendment, to wit: dishonesty to the School Board, derogatory and insensitive comments in front of students and staff members made during the course of his employment and disruption caused to the educational environment.

Appellants simply did not violate Mr. Thompson's constitutional rights. Additionally, even if Mr. Thompson's First Amendment rights were implicated, Appellants are nonetheless entitled to qualified immunity, as it was completely reasonable for Superintendent Small and the Board members to believe they had the right to transfer Mr. Thompson to a teaching position based upon his dishonesty and his racially insensitive and ableist comments made during the course and scope of his employment. The reasonableness of Appellants' beliefs are best evidenced by the fact that they actually performed the *Pickering* balancing test before making the decision (and affirming the decision) to transfer Mr. Thompson to a teaching position.

As detailed below, upon receipt of staff complaints about Mr. Thompson's Facebook post, an investigation was conducted to determine whether this was a one-off incident outside of the school environment, or whether this was just one example of a pattern of conduct that permeated into the school environment. The investigation revealed a pattern of conduct that caused Superintendent Small legitimate concern about the negative impact it may have on CVSD's relationship with its community, and perhaps more importantly the students themselves. But rather than making any decision based solely upon his own concerns, Superintendent Small directed that impact interviews be conducted to determine the effect Mr. Thompson's conduct had on the educational environment and students, staff and families. These impact interviews, which were conducted with several different populations of the CVSD community, mirrored the *Pickering* balancing test.[1] These interviews established the potential harm and disruption Mr. Thompson's conduct could cause, as parents reported an unwillingness to send their children to a school at which such an administrator worked, and staff members reported they would have a difficult time working with such an administrator.

---

[1] Individuals interviewed were told only that an unidentified administrator had engaged in the conduct at issue. Mr. Thompson's identity was not known to those interviewed.

8

After completion of the impact interviews, Mr. Thompson was given an opportunity to address the situation with CVSD administration at a Notice and Opportunity Meeting held on September 22, 2020. Mr. Thompson displayed no understanding as to how his words and actions could harm CVSD's relationship with its community, his own relationship with students, staff and the community, or students themselves. Instead, Mr. Thompson was dishonest with administration, claiming that his Facebook post had been "hacked."

A second investigation was commenced to address Mr. Thompson's claim that his Facebook post had been "hacked." A forensic computer expert was unable to find any evidence to support Mr. Thompson's claim. Thereafter, a second Notice and Opportunity Meeting was held on May 6, 2021. Mr. Thompson again showed no insight into the problematic nature of his conduct and instead, in the face of forensic evidence to the contrary, doubled-down on his blatant dishonesty, again claiming that his Facebook post had been hacked.

Faced with Mr. Thompson's inability to understand how his at-school words and conduct could damage relationships and students, and faced with Mr. Thompson's dishonesty, Superintendent Small properly transferred Mr. Thompson to a teaching position. The Board subsequently upheld that decision.

Mr. Thompson's dishonesty and his at-school conduct are not protected by the First Amendment. Appellants' decision to transfer Mr. Thompson to a teaching position was therefore constitutionally permissible. However, even if the First Amendment was somehow implicated, Appellants are nonetheless entitled to qualified immunity as they acted reasonably in basing their decision upon the appropriate *Pickering* balancing test.

### III.   STATEMENT OF FACTS

Mr. Thompson was an assistant principal at Evergreen Middle School ("EMS") in the Central Valley School District ("CVSD"). (2-ER-15).

### A.   Mr. Thompson's Facebook Post

On August 17, 2020, Mr. Thompson posted a rant on his Facebook page that included profanity and derogatory and violent language. (2-ER-16). Specifically, Mr. Thompson posted:

> Demtard convention opens and the only facts spoken were the names. Lie after lie. The fact checkers could retire on Michelle Obama's rant alone. What s hatefull racists bitch. If you need to lie to try and win you are just shit. If you believe them you are even worse. Wake the fuck up America. You are being played by a fake media, athleats and performers (who are really clueless and flyers with pedophile man) and the former DNC, now just the little bitch of Marxist BLM, Antifa, and Soroas socialist. You are missing out on a great country and the rest of us are sick and tired of your act and going to take you to the woodshed for a proper education. May God help you to pull your heads out of

your asses so we will not have too. Time for the red tide. Lets see how long until the FB liberal defenders take this one down.

(2-ER-65, 85).

The post was seen by a fellow CVSD employee and was forwarded to other employees until finally making its way to CVSD Superintendent Ben Small. (2-ER-32). The language contained in the post was concerning for many reasons, but it was especially concerning because of the use of the term "Demtard." (2-ER-57; 3-ER-350-51, 376). The CVSD employees who had seen the post expressed serious concerns about it, contributing to Superintendent Small's own concern. *Id.* At the time Superintendent Small received the post, it was unclear where the post was made, how many people had seen it and whether there was further conduct that warranted action. *Id.* As such, Superintendent Small placed Mr. Thompson on paid administrative leave so that an investigation into the matter could occur.

**B. Investigation into Mr. Thompson's Conduct**

On August 20, 2020, CVSD retained attorney Ann Allen as an independent third-party investigator to investigate Mr. Thompson's conduct. (2-ER-32). The purpose of Ms. Allen's investigation was two-fold: (1) to determine whether students, teachers or administrators within CVSD had seen the post and if so, how it affected them; and (2) to determine whether this post was merely one example of a pattern of similar conduct. (2-ER-34). Ms. Allen first spoke with the

11

individuals who had personally seen the Facebook post. *Id.;* (3-ER-223). These individuals, employees of CVSD, had seen the post and were concerned about the language used by Mr. Thompson. (3-ER-223-26). Specifically, the individuals reported to Ms. Allen that the word choice was "shocking and concerning," that the word "demtard" was "highly offensive and potentially extremely hurtful to students, families and members of the community and that the tone was hateful, angry, extreme intolerant and threatening." *Id.* Mr. Thompson's shocking language had caused the CVSD employees to have concern about the negative impact it could have between CVSD and its community because the post was not reflective of CVSD's mission to help all children. *Id.*

Ms. Allen next interviewed CVSD administrators Mike Syron, Kerri Ames, Kent Martin and Katie Louie. (3-ER-226). These administrators had all worked with and/or supervised Mr. Thompson. The purpose of these interviews was to determine whether there had been a pattern of conduct that indicated that Mr. Thompson's behavior would likely be repeated. (3-ER-227-29). Mr. Syron is the principal at EMS and was Mr. Thompson's direct supervisor. *Id.* Mr. Syron informed Ms. Allen about a presentation Mr. Thompson had given to EMS staff wherein he used inappropriate and insensitive words that had caused strife among the staff members (i.e., calling students of the past "Norman Rockwell Kids" and

students of today "Tide Pod Challenge Kids," saying that students today have "snowflake" syndrome and that they are entitled). (3-ER-250). Ms. Ames similarly worked with Mr. Thompson and told Ms. Allen that Mr. Thompson frequently used the term "short bus" in reference to special needs students. (3-ER-227-28). Ms. Louie told Ms. Allen about a focus group that she and Mr. Thompson worked on to determine how to better serve all students, including hosting a focus group of ten (10) students who self-identified as Black. (3-ER-228). Ms. Louie explained to Ms. Allen that at this focus group Mr. Thompson had moved off script and asked one particular student if he felt teachers had treated him differently than the "normal" students, indicating that a Black student was not "normal." *Id.*

Based upon these interviews, Ms. Allen assessed that Mr. Thompson's commentary is often viewed as inappropriate for an individual in an administrative role at CVSD and that it appeared to others that he lacked insight as to the harm his words and actions caused. (3-ER-229). Ms. Allen provided these findings to Assistant Superintendent Jay Rowell, who determined that the Facebook post was not an isolated incident, and it was clear that remediation and correction of Mr. Thompson's behavior might not be possible. (2-ER-61).

13

## C.    Impact Interviews

From September 8, 2020 to September 15, 2020, Mr. Rowell conducted "Impact Interviews" to determine the potential impact of Mr. Thompson's statements, both on Facebook and while working. *Id.* The purpose of the impact interviews was to determine whether Mr. Thompson's conduct had a negative impact on his ability to work in a leadership position at CVSD, and how his comments impacted administrators, parents, teachers and school board members. *Id.* Mr. Rowell interviewed two board members, two in-district administrators, two in-district teachers and parents of current CVSD students. (2-ER-62). In these interviews, Mr. Rowell read to the interviewee the content of the Facebook post (without identifying Mr. Thompson's identity) and the comments Mr. Thompson had made while at work. *Id.* Mr. Rowell then asked for the interviewee's impressions and thoughts about the same. *Id.* The interviewees expressed shock and concern about the statements and found Mr. Thompson's statements insensitive and detrimental to his relationship with staff, students and the community. *Id.* Specifically, CVSD staff reported that they would have difficulty working with an assistant principal who engaged in the identified conduct, and that the conduct would detrimentally impact community relationships. *Id.* The parents Mr. Rowell interviewed even reported that they would be wary of sending

their children to any school led by an administrator who engaged in such conduct, and that the derogatory, hateful and potentially racist statements reflect poorly on CVSD. *Id.*

### D. September 22, 2020 Notice and Opportunity Meeting

On or around September 15, 2020, Mr. Rowell called Mr. Thompson's CVSD representative (Ty Larsen) to schedule a Notice and Opportunity Meeting. *Id.* This Notice and Opportunity Meeting was held on September 22, 2020 with Mr. Thompson to discuss two allegations against him. (2-ER-63). The two allegations against Mr. Thompson were: (1) he posted an inappropriate and offensive comment on Facebook recently; and (2) he made derogatory and insensitive comments while at work. *Id.* At this meeting, Mr. Thompson was asked a number of questions regarding what he had posted, who he intended to see the post and questions about the nature of the words and phrases he used in the post. (2-ER-64). Mr. Thompson claimed that he believed he sent the Facebook post in question to only twelve (12) select friends that share similar political opinions as him. *Id.* Mr. Thompson had in fact posted this on his Facebook page for all of his "friends" to see. *Id.* Mr. Rowell showed Mr. Thompson the post submitted to CVSD. (2-ER-65). Mr. Thompson claimed that he had written a different, albeit

15

similar, post that censored profanity, did not have spelling errors, and had a few word changes. *Id.* The post Mr. Thompson claims to have written is as follows:

> Demtard convention opens and the only facts spoken were the names. Lie after lie. The fact checkers could retire on Michelle Obama's rant alone. If you need to lie to try and win you are just shit. If you believe them you are even worse. Wake the f@#k up America. You are being played by a fake media, athlete and performers (who are really clueless and flyers with pedophile man) and the former DNC, now just the little puppet of Marxist BLM, Antifa, and Soroas socialist. You are missing out on a great country and the rest of us are sick and tired of your act and going to take you to the woodshed for a proper education. May God help you to pull your heads out of your asses. Time for the red tide. Lets see how long until the FB liberal defenders take this one down.

*Id.*

Mr. Thompson then claimed that upon discovering that this post was seen by others on his Facebook wall, as opposed to being sent to a private group, he "panicked" and "deleted the post and disabled his Facebook account." (2-ER-66). Mr. Thompson then expressed that he was sharing his political frustration, did not regret making the comments, but conceded that they would not be viewed as civil to the public at large. *Id.* Mr. Rowell also questioned Mr. Thompson about the other reported inappropriate comments he had made while at school. (2-ER-67). Mr. Thompson did not deny the comments, but stated that he did not remember making some of them. *Id;* (2-ER-68, 131).

**E. Alleged Hacking and Subsequent Investigation**

On October 21, 2020, Mr. Thompson submitted a written document to Mr. Rowell through Mr. Larsen. (2-ER-170). This document was prepared by Mr. Thompson and detailed his research and response to the allegations presented. *Id.* Mr. Thompson also discussed his belief that a hacker had potentially changed a few words in his post and made his post visible to his entire "friends" list. *Id.*

As a result of Mr. Thompson's claims that his Facebook account had been hacked and his post modified, Mr. Rowell contacted a forensic examiner to determine whether Mr. Thompson's Facebook account had actually been compromised. (2-ER-69). The forensic examiner, Joshua Michel, completed his forensic investigation on December 15, 2020. (2-ER-70). Per the report, Mr. Michel found no evidence of unauthorized use of Mr. Thompson's Facebook account. (3-ER-287). In addition, Mr. Michel reported that Mr. Thompson had been very reluctant to provide his electronic devices and Facebook data history. (2-ER-70). Mr. Michel reported that Mr. Thompson refused to give him his login credentials, and after much resistance provided only an incomplete history of his Facebook data. *Id.* Mr. Rowell found that it was clear from Mr. Michel's report that Mr. Thompson had not been entirely cooperative or forthcoming with Mr. Michel, which in addition to Mr. Michel's conclusion that there was no evidence

that Mr. Thompson's Facebook account had been "hacked," caused Mr. Rowell serious concern about Mr. Thompson's truthfulness in the investigation. *Id.*

## F.     Voluntary Transfer Agreement

On January 20, 2020, Mr. Rowell emailed Mr. Thompson, via his representative (Mr. Larsen), a Transfer Agreement. (2-ER-183). This agreement was intended to effectuate Mr. Thompson's voluntary relinquishment of his assistant principal position and a transfer to a new position, effective June 30, 2021. *Id*; (2-ER-71)*.* The agreement would also provide Mr. Thompson with a new contract with CVSD to begin September 1, 2021 and a supplemental contract for July and August 2021. (2-ER-71). Mr. Rowell informed Mr. Larsen that CVSD was proposing the Transfer Agreement in part to avoid having to address the allegation that Mr. Thompson had lied, and continued to lie, in asserting that someone hacked his account. *Id.* Mr. Thompson rejected the agreement on February 10, 2021. *Id.;* (2-ER-190).

## G.     May 6, 2021 Notice and Opportunity Meeting

Based upon the findings of Mr. Michel's report and Mr. Thompson's rejection of the transfer agreement, a second Notice and Opportunity Meeting was scheduled for May 6, 2021. (2-ER-71, 72). This meeting included two new allegations against Mr. Thompson: (1) he interfered with CVSD's investigation by

deleting emails, by refusing to provide the forensic examiner with his devices, and by wiping and clearing his digital devices; and (2) he had been dishonest by saying that his Facebook account was hacked. *Id.* At this meeting, Mr. Thompson was asked whether he recalled the forensic examiner requesting that he provide him with any security-related emails to and from Facebook related to the August 17th post. *Id.* Mr. Thompson claimed that he did not get any of those emails and that as a practice he deletes his personal emails. *Id.* Mr. Thompson also claimed that he did not receive any emails from Facebook. *Id.* Mr. Thompson denied obstructing the investigation, despite having not produced the requested material to Mr. Michel. *Id.* Mr. Thompson also continued to maintain that his account had been hacked and that he did not file a report with Facebook because he believed a Facebook employee to be the alleged hacker, despite the lack of evidence supporting the same. (2-ER-74).

**H.    Notice of Transfer to Subordinate Position**

On May 10, 2021, Superintendent Small sent a Notice of Transfer to a Subordinate Position via certified and regular mail to Mr. Thompson. (2-ER-76-77). The Notice of Transfer informed Mr. Thompson that Pursuant to RCW 28A.405.230, he had the right to meet informally with the School Board in an executive session to request that the Board reconsider Mr. Small's decision to

transfer him. *Id.* On June 14, 2021, Mr. Thompson attended a regularly scheduled Board meeting. (2-ER-78). Prior to this meeting, the Board was advised of the investigation into Mr. Thompson's Facebook post and his prior conduct at school. (3-ER-362). Upon Mr. Thompson's appeal to the Board, CVSD provided the Board with the notes from the investigation and screenshots of the alleged "hacked" post and alleged "real" post. *Id.* Mr. Thompson was also given the opportunity to present written information to the Board. *Id.* The Board heard from both Mr. Rowell and Mr. Thompson about the issue. *Id.* Mr. Rowell discussed how and why the investigation was conducted, the pattern of behavior uncovered and the need to remove Mr. Thompson from his assistant principal position. *Id.* The Board also heard from Mr. Thompson. *Id.* Mr. Thompson focused his presentation on how the message was posted on his private Facebook page, that it was within his First Amendment right to do so and that this investigation and transfer were an overreaction. *Id.* Mr. Thompson did not claim any legal basis or procedural defects in the process. *Id.*

The Board then went into executive session to deliberate, as it would for any personnel issue that is to be decided. *Id.* However, the Board did tread carefully to make sure that it was not infringing on any protected rights. *Id.* The Board was specifically concerned about Mr. Thompson's dishonesty to

administration and the Board and the reported comments he made while at work. (3-ER-365). The Board also considered the Impact Interviews and the responses from community members. *Id.* The Board also believed that Mr. Thompson's conduct had a negative effect on CVSD and the reputation of CVSD in the community. *Id.* The Board also believed that Mr. Thompson's conduct had a negative and harmful effect on the students and was therefore very inappropriate for an administrator in a leadership position. *Id.*

The Board decided to uphold Superintendent Small's decision to transfer Mr. Thompson to a teaching position. (3-ER-365). This decision was not based solely on the content of the Facebook post, but on the pattern of behavior that was discovered through the investigation of the concerning Facebook post and the apparent dishonesty to CVSD by Mr. Thompson. *Id.* Mr. Thompson further showed the Board throughout the investigation that he did not understand how his words and conduct could negatively impact his relationship with staff, students and the community, as well as CVSD's relationship with staff, students and the community. (3-ER-366). Mr. Thompson's political views were never discussed by the Board. *Id.* Rather, the Board's decision was based solely upon the collective members' beliefs that Mr. Thompson's use of derogatory, demeaning and stigmatizing words was harmful to students, parents, staff and the CVSD

community, as well as CVSD's relationships with students, parents, staff and the CVSD community. *Id*.

## IV.   ARGUMENT AND ANALYSIS

### A.   Standard of Review

This Court reviews *de novo* a denial of summary judgment. *Mukherjee v. Immigration & Naturalization Serv.*, 793 F.2d 1006, 1008 (9th Cir. 1986). Summary judgment is appropriate when the moving party establishes that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-moving party to set out specific facts showing that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute … to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578 (1986) (internal citations omitted). In evaluating a motion for summary judgment, the Court must draw all

reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B.      Appellants are Entitled to Qualified Immunity.**

"Government officials performing discretionary functions enjoy qualified immunity from civil damages so long as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir. 1989) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Rivas-Villegas v,. Cortesluna*, 142 S. Ct. 4 (2021). Under qualified immunity, a public official is protected from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Not only must Mr. Thompson prove that a right was clearly established at the time of the alleged deprivation, *Baker v. Rancansky*, 887 F.2d 183, 186 (9th Cir. 1989), but the right's contours must also be sufficiently definite that any reasonable official would understand that the challenged conduct was violating the right. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). A case directly on point is not necessary, but prior authority "must have placed the constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### 1. Mr. Thompson did not Suffer a Constitutional Violation.

The district court denied Appellants' summary judgment on the premise that questions of fact exist regarding whether Mr. Thompson's speech was a matter of public concern; whether Mr. Thompson spoke as a private citizen when making the speech; and whether Appellants had adequate justification to treat Mr. Thompson differently than other members of the public, *all as it relates to Mr. Thompson's Facebook post*. (1-ER-9). In so holding, the district court failed to appreciate that Mr. Thompson was not transferred to a teaching position solely because of his Facebook post. While Mr. Thompson's Facebook post triggered CVSD's investigation, Mr. Thompson was transferred for his conduct at school and not because of his political views or as a result of exercising his First

24

Amendment rights. Appellants are entitled to qualified immunity first and foremost because Mr. Thompson did not suffer a constitutional violation.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Where a public employee claims that his First Amendment rights have been violated, the Court applies a five-step test to balance the government's rights as an employer and the plaintiff's rights as a citizen, pursuant to which the Court must determine:

> (1) Whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

If the plaintiff passes the first three steps, the burden shifts to the government to show that "under the balancing test established by [*Pickering*], the [state]'s legitimate administrative interests outweigh the employee's First Amendment Rights. *Id.* (citing *Thomas v. City of Beaverton*, 379 F.3d 802, 808

(9th Cir. 2004)). If the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating the fifth element. *Id.*

> ### a. Mr. Thompson did not Speak on a Matter of Public Concern when he Referred to Students in a Derogatory Manner and was Dishonest to the School Board.

Public debate about politics or governmental affairs is generally considered a matter of "public concern." Whether an employee's speech addresses a matter of public concern, however, must be determined by the content, form and context of a given statement as revealed by the whole record. *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 47-48 (1983)). "In evaluating the First Amendment rights of a public employee, the threshold inquiry is whether the statements at issue substantially address a matter of public concern." *Roe v. City & Cnty. of S.F.*, 109 F.3d 578, 584 (9th Cir. 1997). If they do not, the First Amendment is not triggered. *Brewster v. Bd. of Educ.*, 149 F.3d 971 (9th Cir. 1998).

Speech that does not relate to a matter of political, social or other concern to the community will not be considered a matter of public concern. *Warren v. Warrior Golf Capital, L.L.C.*, 126 F. Supp. 3d 988, 994 (E.D. Tenn. 2015) (calling a patron of a golf course the "N-word" was not a matter of public concern); *Cantwell v. Conn.*, 310 U.S. 296, 310 (1940) ("resorts to epithets or personal abuse

is not in any proper sense communication of information or opinion safeguarded by the Constitution"); *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530 (6th Cir. 2020) (government did not violate the First Amendment in terminating the employment of an employee who posted a comment on Facebook using the word "Niggaz" because under the Pickering analysis, the use of that slur and the effect it had on her coworkers and the community tipped the balance substantially in favor of the employer).

Here, the "speech" that precipitated Mr. Thompson's transfer was not a matter of public concern. The "speech" in question was Mr. Thompson's use of the term "short bus" in reference to special education students, referring to current students as "Tide Pod Challenge Kids," saying that students today have "snowflake" syndrome and are entitled, and asking a Black student, in front of other students during a cultural-sensitivity focus group, if he felt that he was treated differently than the "normal" students. (3-ER-227-29). These derogatory and highly offensive terms were used in reference to students and/or in front of students and staff at CVSD and were made by Mr. Thompson in the course of his employment. This "speech" fails to rise to a matter of public concern.

Further, Mr. Thompson was transferred because he was dishonest to the School Board and school Administrators. *See Noel v. Andrus*, 810 F.2d 1388 (5th

27

Cir. 1987) (dishonesty towards the school or school board can be adequate grounds for adverse employment action). When questioned about his Facebook post, Mr. Thompson asserted that his account had been "hacked." (2-ER-70). Based upon Mr. Thompson's "hacker" claim, CVSD hired a forensic examiner to determine the source of this alleged "hacker." *Id.* When the forensic examination failed to find any evidence of an alleged hacker, Mr. Thompson instead doubled down and further asserted that the failure to find evidence of a hacker was because the hacker was a Facebook employee. (2-ER-198). The findings of the forensic examination and the unreasonable assertion that a Facebook employee hacked Mr. Thompson's Facebook and changed only a few words in his post put Mr. Thompson's credibility and trustworthiness as a school administrator in doubt. (2-ER-70; 3-ER-365). Mr. Thompson's dishonest assertions likewise do not amount to speech on a matter of public concern.

> **b. Mr. Thompson Spoke as a Public Employee as his Inappropriate, Derogatory and Dishonest Comments Were Made at School, Within the Course of his Employment.**

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Here, the "speech" at issue

occurred at school, during school hours, while Mr. Thompson was acting as an assistant principal. These comments were undeniably made in his role as a public employee. It is well settled that speech pursuant to an employee's official duties do not insulate the speaker from discipline. "The First Amendment does not protect speech by public employees that is made pursuant to their employment responsibilities – no matter how much of a matter of public concern it might be." *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016).

Mr. Thompson spoke as a public employee in the Notice and Opportunity Meetings and throughout the investigation wherein he was dishonest about his Facebook post and failed to be forthright and cooperative. Mr. Thompson also spoke as a public employee when he gave presentations to students and staff and made derogatory, demeaning and insensitive comments in front of and to the same.

### c. Mr. Thompson's Transfer to a Teaching Position was not Motivated by any Protected First Amendment Speech.

Mr. Thompson was transferred because he was uncooperative, obstructionist and most importantly, dishonest to the Board during the investigation into his conduct.[2] He was also transferred because his use of non-

---

[2] Mr. Thompson claimed a "hacker" altered his post by inserting profanity and violence, as well as altering words so that they were misspelled. Mr. Michel's investigation disproved Mr. Thompson's "hacker" claim. Further, the idea that a "hacker" would alter a post to create misspellings in nonsensical. To any

29

protected, derogatory and racially insensitive comments had the potential of harming his relationships with students, staff and the community, as well as CVSD students themselves. The comments also jeopardized CVSD's relationship with the community it serves. Further, Ms. Allen's investigation revealed that teachers and staff had heard Mr. Thompson make harmful statements in the school setting to staff, and even worse, to students. (2-ER-79-80).

CVSD has an obligation to foster an inclusive learning environment for all students, including minority and special needs students. (2-ER-134). Since Mr. Thompson's derogatory and racially insensitive statements about and to students were not protected speech, the First Amendment does not preclude CVSD from transferring Mr. Thompson to a teaching position based upon those comments. While Mr. Thompson's harmful statements about and to students provided CVSD with a legal basis to transfer him to a teaching position, so too did his conduct during CVSD's investigation into the Facebook post.

CVSD did not transfer Mr. Thompson until after it learned of his failure to cooperate, obstructionism and dishonesty. (2-ER-80). As such, even if Mr. Thompson had some First Amendment right to refer to students in derogatory and

---

reasonable person it is clear that Mr. Thompson created the censored version of the post after learning that CVSD administration had seen his Facebook post.

offensive terms, and even if he had the First Amendment right to suggest to a Black student that he was not a "normal" student, Mr. Thompson's First Amendment claim still fails, as CVSD had an independent basis to transfer him to a teaching position. These concerning and legitimate reasons for the transfer have nothing to do with Mr. Thompson's Facebook post.

### d. CVSD Had an Adequate Justification for the Transfer.

"The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). The "pertinent considerations" are whether the statement (a) impairs discipline by superiors or harmony among co-workers; (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer. *Rankin v. McPherson,* 438 U.S. 378, 388 (1987).

Here, assuming *arguendo* that Mr. Thompson had a constitutionally protected right to use such demeaning and derogatory language in reference to students at school and had a constitutionally protected right to engage in

dishonesty to the School Board, the harm and disruption caused by that speech justified the transfer. Courts have consistently emphasized "the need for affirming the comprehensive authority … of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). While school employees do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Id.* at 506, courts have also acknowledged that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267 (1988), *quoting Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. at 683 (internal citation and quotation marks omitted); *see also Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.,* 591 F. Supp. 2d 511, 519-20 (S.D.N.Y. 2008) ("*Weingarten I*") (deferring the expertise of school officials to "understand the needs, capabilities and vulnerability of [the student] population").

In applying the *Pickering* balancing test, the Ninth Circuit recognized both the teacher's interest in speaking out on a matter of public concern and the school's consideration of disruption, including intra-school disharmony, the degradation of the teacher-principal relationship, the interference with the teacher's duties and the

ultimate falsity of the teacher's allegations. *Brewster*, 149 F.3d at 981. The relationships between the administrators and teachers, and between administrators and students are "close working relationships with frequent contact and requires trust and respect in order to be successful." *Id.* In *Brewster,* a single co-worker's testimony that the speech was "hurtful" and led to distrust indicated intra-school disharmony. *Id.* Here, Mr. Rowell's impact interviews establish the clear risk of serious harm and disruption to not only Mr. Thompson's relationship with staff, students and the community, but also to CVSD's relationship with the community it serves. Indeed, the fact that CVSD conducted impact interviews establishes that the transfer was based upon the impact of Mr. Thompson's conduct at school, as opposed to any political views of Mr. Thompson.

Mr. Thompson's conduct had the potential to interfere not only with his supervision of staff but in disciplining students for engaging in similar behavior.[3] Further, as a result of the conduct at issue, Mr. Thompson had already been prohibited from presenting to the staff, even though that was part of his job, based on derogatory terms he had previously used in staff presentations. (3-ER-228,

---

[3] *See, e.g. CVSD Policy 3207* (identifying prohibited harassment, intimidation and bullying to include slurs, demeaning comments and statements motivated by race or disability) at (3-ER-215); *CVSD Policy 3220* (may not cause disruption at school or violate Policy 3207) at (3-ER-219).

252). Mr. Thompson's conduct also undermined CVSD's commitment to a safe and supportive school and work environment for all students, staff, families and community members. (2-ER-133).

The established disruption caused by Mr. Thompson's conduct, as well as the reasonably anticipated future disruption weighs heavily in favor of CVSD. "In conducting this balancing, courts must give government employers wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees who's conduct hinders efficient operation and to do so with dispatch." *Gilbrook v. City of Westminster*, 177 F.3d 839, 867 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999).

Here, CVSD's interests when applying the *Pickering* balancing test must be given great weight because of Mr. Thompson's role as an administrator. As an administrator, Mr. Thompson was a leader, and as a leader his words and conduct can be viewed as the words and conduct of CVSD and can likewise act as a tacit approval of those words and conduct to his subordinates. Mr. Thompson would have still been transferred in the absence of his Facebook post, as his in-school conduct and dishonesty justified such transfer.

Finally, it simply goes against public policy to protect and allow an administrator in a leadership position at a public middle school to espouse such

insensitive and derogatory rhetoric in front of and to children and other staff. It additionally is against public policy to protect and allow a government employee and school administrator to be dishonest to his superiors and the school board. Mr. Thompson was transferred for these legitimate reasons, and as such, Appellants are entitled to qualified immunity because Mr. Thompson's constitutional rights were not violated.

### 2. Appellants are Entitled to Qualified Immunity Because They Acted Reasonably at All Times.

As explained above, CVSD did not violate Mr. Thompson's First Amendment rights. However, even if the Court found a question of fact on that issue, qualified immunity is nonetheless proper unless the outcome of the *Pickering* balancing test so clearly favors Mr. Thompson that it would have been patently unreasonable for Appellants to believe they had the right to transfer Mr. Thompson to a teaching position.

A clearly established right is one that is "sufficiently clear that every reasonably official would have understood that what he is doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't,* 872 F.3d 938, 946 (9th Cir. 2017). Courts must not "view constitutional rights in the abstract but rather 'in a more particularized, and hence more relevant, sense.'" *Brewster v. Bd. of Educ.,* 149 F.3d at 977. Courts look "not to the constitutional guarantees themselves" but to

35

"the various doctrinal tests and standards that have been developed to implement and to administer those guarantees." *Id.* Although it is not necessary to identify a case "precisely like this one," *Eng v. Cooley,* 552 F.3d at 1076, there must be "some parallel or comparable factual pattern" to establish that the contours of the right were clearly established. *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). Thus, plaintiffs "generally must identify a case where an officer acting under similar circumstances as [plaintiff] was held to have violated [that right]." *Shafer v. Cnty. Of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

"Because the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Moran v. State of Wash.,* 147 F.3d 839, 847 (9th Cir. 1998) ("today we join the chorus of voices from other circuits that have specifically observed the difficulty of finding clearly established law under *Pickering*"). "Because the *Pickering* balance 'requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified

immunity.'" *Gilbrook v. City of Westminster*, 177 F.3d at 867, *citing Brewster*, 149 F.3d at 980. "That is, in the qualified immunity context, the question becomes whether "the outcome of the *Pickering* balance so clearly favors [Plaintiffs] that it would have been patently unreasonable for [Defendants] to conclude that the First Amendment did not protect [Plaintiffs'] speech." *Moonin v. Nev. Ex rel. Its Dep't of Pub. Safety Highway Patrol,* 960 F. Supp. 2d 1130, 1139-40 (D. Nev. 2013), citing *Gilbrook,* 177 F.3d at 867.

Mr. Thompson was transferred from his position for reasons other than his alleged "political speech." However, even if the Court determines that there exists a question of fact regarding the reason for Mr. Thompson's transfer, summary judgment is nonetheless proper for Appellants because their actions, as guided by the *Pickering* analysis, were reasonable.

### a. Superintendent Small Acted Reasonably at All Times

The superintendent of a school district is tasked with broad responsibility to manage, administer and ensure the success of the school district. The facts are clear that Superintendent Small acted reasonably as a school administrator at all times: Superintendent Small received complaints from school employees who were concerned about Mr. Thompson's Facebook post. Superintendent Small was concerned about the educationally-derogatory language ("tard") used in an

37

apparently-public post by an educator. Superintendent Small placed Mr. Thompson on paid administrative leave pending an investigation by a third-party attorney to determine how widely disseminated the post was (including whether it was seen by students), whether there were other posts using the demeaning and insulting language, and whether Mr. Thompson used such terms in and around students. Lest there be any question about the demeaning, insulting, stigmatizing, derogatory and offensive nature of an educator using the term "tard," Appellants draw the Court's attention to Rosa's Law, which was signed into effect in 2010 by President Barack Obama after it passed unanimously in both the House and the Senate. Rosa's Law can be found at 124 Stat. 2643. Rosa's Law amended federal law that school district administrators deal with on a daily basis, including sections of the Rehabilitation Act, the Individuals with Disabilities Education Act (IDEA) and the Elementary and Secondary Education Act. The revisions removed the words "mental retardation" and replaced them with the words "intellectual disability" or "intellectual disabilities." Federal law was amended in that regard because of the recognized harm caused by the term "retarded." As stated in Senate Report 111-244 (2010) provides the basis for the amendments:

> Recognizing that the term ``mental retardation'' was previously considered appropriate to describe individuals with significant limitations in intellectual and cognitive functioning, the committee believes

that such terms are no longer suitable and advocates a substitution of these terms with ``intellectual disability'' or ``an individual with an intellectual disability.

The committee believes that the terms ``mentally retarded,'' ``mental retardation,'' and variations of these terms, to describe individuals with intellectual disabilities are anachronistic, needlessly insensitive and stigmatizing, and clinically outdated.

Within the past 30 years, the terms ``mental retardation'' and ``mentally retarded,'' or derivatives of those terms, have also developed into colloquial slurs and pejorative phrases used to demean and insult both persons with and without disabilities.

Superintendent Small knew only that he had an administrator in his school district who posted a term on social media that has a recognized harmful effect on special needs students. Not knowing how far and wide the post had been disseminated, and not knowing whether Mr. Thompson had similar posts, and not knowing if Mr. Thompson used that type of term at school, Superintendent Small reasonably, and correctly, believed it was constitutionally permissible to place Mr. Thompson on paid administrative leave so that the foregoing questions could be answered through an investigation by a third-party.

The reasonableness of Superintendent Small's decision in that regard is evidenced by the fact that the investigation confirmed that Mr. Thompson's use of demeaning and racially-insensitive terms occurred at school. But rather than acting

39

upon his own belief that Mr. Thompson's conduct would negatively impact CVSD and its relationship with its community, Superintendent Small directed that Mr. Rowell conduct impact interviews with various community members to find out the actual impact that conduct did or could have. The community members overwhelmingly reported that Mr. Thompson's conduct was egregious and could prevent them from working at or sending their children to CVSD. Importantly, these community members believed that Mr. Thompson's conduct would prevent him from adequately leading CVSD staff and/or disciplining students. Mr. Thompson was afforded the opportunity to speak to these allegations in the notice and opportunity meetings and either explain the situation or demonstrate a willingness to correct his behavior. Mr. Thompson did neither. Instead he showed no understanding of the inappropriateness of his behavior as a school administrator and made baseless and untruthful assertions about a hacker employed by Facebook editing his post.

Not only did Mr. Thompson display a lack of judgment necessary for a school administrator, and not only was he dishonest to the school district, but he also failed to uphold CVSD's Recommitment to Equity and Inclusion – an important CVSD resolution to ensure a safe and supportive school and work environment for all students, staff, families and community members. As

evidenced by Superintendent Small's Notice of Transfer to Mr. Thompson, Superintendent Small's decision was justified by many individual factors:

> First, your behavior while serving as an administrator has disrupted harmony among building staff and District representatives, to the point that returning you to a position as an administrator supports a reasonable prediction of disruption.

> Second, you have made comments that can be reasonably perceived as insensitive, at best, and contrary to the District's mission of creating an inclusive culture. Given some of the comments you've made, significant concerns exist about your ability to be the type of administrator that serves the District's best interest.

> Third, your behavior, including your lack of inclusiveness, has caused a lack of confidence by administrators (and others) and a concern about your willingness to promote or even embrace the District's interest in an inclusive learning and working environment.

> Fourth, your behavior has interfered with your ability to do your job, especially as a student disciplinarian and staff evaluator.

> Fifth, there is good reason to believe that you interfered with a District investigation about your behavior and were not entirely truthful during that investigation. The District's administrators must be trustworthy, and your actions during the District's investigation put your trustworthiness in question.

> Sixth, your response to District concerns about your behavior demonstrates a lack of awareness and insight needed for a school administrator. As a school district administrator who interacts with students, staff, and the public you have a great deal of authority and need for public accountability. As such, your behavior is under greater scrutiny than if you were in a different position.

> Finally, given a balancing of all circumstances, District administrative staff have determined that the overall best interest of the District would be served by transferring you from an

administrative position to a non-administrative certificated teaching position.

(2-ER-204).

Notably, Mr. Thompson's transfer was in no way based upon his political opinions or his expression of those opinions. Mr. Thompson was transferred because he had affirmatively shown the lack of judgment and inclusiveness necessary of a school administrator. A school superintendent must uphold the directives of the school board, state and federal law, and ultimately protect the interests of the community he serves. A school superintendent must be given the authority to do so, as the superintendent is well-positioned to know the needs and concerns of his or her school district's community. Denying qualified immunity in this instance would hamstring the authority of a school superintendent to ensure that all students and staff within his or her district work and learn in a safe and supportive environment. A denial of qualified immunity here would send the message that it is permissible for staff or administrators tasked with the education and protection of students to espouse racial, derogatory and insensitive commentary within the school environment. Not only was it reasonable for Superintendent Small to take action after discovering Mr. Thompson's conduct, he was required to take such action to protect the CVSD community.

Further, Mr. Thompson's conduct caused a disruption to the teaching and learning environment. A reasonable school administrator would believe that a school district could regulate speech that would substantially disrupt, or materially interfere with school activities. *See, Chandler v. McMinnville Sch. Dist.,* 978 F.2d 524, 529 (9th Cir. 1992), *citing Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. at 514. The Court in *Tinker* noted that while First Amendment protection was afforded to students and teachers, it did not extend to speech that "materially disrupt[ed] classwork or involve[ed] substantial disorder or invasion of rights of others." *Tinker* at 513. "Unquestionably, the First Amendment gives a teacher the right to speak his mind; but it does not give him the right to disrupt a school or to choose its principals or to sabotage its programs." *Glover v. Daniel*, 318 F. Supp. 1070, 1075 (N.D. Ga. 1969), *aff'd*, 434 F.2d 617 (5th Cir. 1970). Avoiding disruption of the workplace has long been recognized as an important public employer interest. *Rankin v. McPhearson,* 438 U.S. at 388; *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992). Superintendent Small properly investigated the impact of Mr. Thompson's conduct, taking into consideration the disruption among staff and the impact on Mr. Thompson's ability to carry out the requirements of his job while balancing Mr. Thompson's First Amendment rights. Superintendent Small acted reasonably and is thus entitled to qualified immunity.

43

### b. The Individual Board Members Acted Reasonably at All Times

A school board has ultimate authority to promote the effective, efficient, or safe management and operation of the school district. RCW 28A.320.010. Here, the School Board members' involvement in this matter was extremely limited. Per RCW 28A.405.230, Mr. Thompson had a right to request that the School Board reconsider Superintendent Small's decision. The School Board's narrow authority upon such request is limited to determining whether to uphold or overturn Superintendent Small's decision. The School Board thus reviewed the reason for the transfer and accepted evidence and testimony from both the administration and Mr. Thompson. (3-ER-361).

As Mr. Thompson had claimed a First Amendment right during the school board meeting, the Board members were careful to balance Mr. Thompson's considerations with the effective and safe management of CVSD. (3-ER-363). However, the School Board ultimately determined that Mr. Thompson's in-school conduct, dishonesty to the school district, and the Board's lack of confidence in Mr. Thompson to adequately perform his job, necessitated upholding Superintendent Small's decision.

Whether or not the underlying factual allegations against Mr. Thompson are disputed is immaterial for the purposes of deciding qualified immunity. It is

material, however, that it is undisputed what information the individual Board members had before them at the time of their decision. (3-ER-361). The school Board members were informed that Mr. Thompson had a pattern of saying derogatory and insensitive comments in front of students and staff, that Mr. Thompson's supervisors did not trust him to present to staff, that community members were concerned about Mr. Thompson's ability to effectively discipline and act as an example to students and that Mr. Thompson had displayed dishonesty to the school administration. Based upon this information the School Board had, it was reasonable for the School Board to believe that transferring Mr. Thompson to a teaching position did not violate his First Amendment rights.

A denial of qualified immunity for the School Board members would strip the authority of a School Board to promote the effective, efficient and safe management and operation of the school district. A School Board is most informed about the needs and concerns of the community it serves and has been afforded the authority to make such decisions for this very reason. A denial of qualified immunity here would prevent school boards from making decisions in furtherance of the interests of the community out of fear of litigation.

The individual School Board members acted reasonably in affirming Superintendent Small's decision.

## V.    CONCLUSION

Appellants are entitled to qualified immunity because (1) Mr. Thompson did not suffer a constitutional violation; and (2) Appellants did not act patently unreasonable in regard to a clearly established right of Mr. Thompson.

Superintendent Small was alerted by CVSD employees that Mr. Thompson had made a Facebook post that contained extremely offensive and concerning language. The derogatory language, especially the use of the term "tard," in Mr. Thompson's post was extremely concerning coming from a school administrator. Superintendent Small <u>had</u> to take action and determine the reach of the post and to what extent this type of language had been used in other contexts. Superintendent Small also had to address the disruption brought to his attention by CVSD employees.

It is common sense that a school administrator in today's society should know and understand the offensiveness of the term "tard" and should never use it in any context, especially publicly or at school. CVSD is home to thousands of students – many of which are disabled or have special needs. CVSD has an important obligation to its students and greater community to provide a safe and inclusive learning environment. A school administrator, in a visible leadership position no less, is obligated to ensure that safe and inclusive learning

46

environment. Mr. Thompson's use of the terms "tard," "short bus," "snowflakes," etc. not only completely undermines CVSD's obligation, but also causes legitimate harm to the community. As a CVSD administrator, Mr. Thompson's conduct can be attributed to CVSD itself. Had CVSD allowed Mr. Thompson to continue this conduct, it would have essentially ratified and endorsed the same. CVSD has a right to control its own speech and message it presents to its community, thus, a reaction to Mr. Thompson's conduct was necessary.

CVSD recognized the seriousness of Mr. Thompson's conduct and the role of speech protections and conducted a thorough *Pickering* analysis. CVSD community members explicitly reported they would be hesitant to send their children to a CVSD school with Mr. Thompson. CVSD staff explicitly reported they would have difficulty working with Mr. Thompson as their supervisor. Throughout the investigation, and even into litigation, Mr. Thompson has maintained that his use of the term "tard" is appropriate. Despite Mr. Thompson's in-school conduct and despite Mr. Thompson's repeated dishonesty, this alone demonstrates why Mr. Thompson had to be removed from a leadership position – he lacks the judgment and inclusiveness necessary for this role.

School district administrators and board members must be afforded the authority to protect the community it serves. A decision against Appellants here

47

would signal that it is permissible for an assistant principal to speak derogatorily and use demeaning language to students and staff at school. A decision against Appellants here would constitutionally protect dishonesty by school leaders. School districts do more than simply teach students their letters and numbers; school districts teach the next generation how to act in society and to be respectful and inclusive to all. Mr. Thompson showed CVSD that he could not be entrusted to take on this responsibility, and as such, Appellants correctly removed Mr. Thompson from his position.

Based on the foregoing, Appellants respectfully request that this Court reverse the district court's denial of summary judgment on the basis of qualified immunity.

Dated this 21st day of July, 2022.

EVANS, CRAVEN & LACKIE, P.S.

By:       s/ Michael E. McFarland, Jr.
      MICHAEL E. MCFARLAND, JR., #23000
      RACHEL K. PLATIN, #58280
      Attorneys for Appellants

## **PROOF OF SERVICE AND CERTIFICATE OF COMPLIANCE**

I hereby certify that on this 21st day of July, 2022, I electronically filed the foregoing Opening Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system which will send notification to the following:

## **COUNSEL FOR APPELLEE**

Michael B. Love
Michael Love Law, PLLC
905 W. Riverside Ave., Suite 404
Spokane, WA 99201
Email:      mike@michaellovelaw.com

Robert F. Greer
Megan Clark
Etter, McMahon, Lamberson,
   Van Wert & Oreskovich, P.C.
618 W. Riverside, Suite 210
Spokane, WA 99201
Email:      robg@ettermcmahon.com
Email:      mclark@ettermcmahon.com

Dated this 21st day of July 2022.

EVANS, CRAVEN & LACKIE, P.S.

By:      s/ Michael E. McFarland, Jr.
MICHAEL E. MCFARLAND, JR., #23000
RACHEL K. PLATIN, #58280
Attorneys for Appellants

49

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  Pursuant to Ninth Circuit Rule 32(e)(4), I certify that the Appellant's Opening Brief has 10,535 words and is in compliance with Rule 32(a)(7)(B).

2.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and the type of style requirements of Fed. R. App. 36(a)(6) because it has been prepared in a proportionally spaced serif typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated this 21st day of July 2022.

EVANS, CRAVEN & LACKIE, P.S.

By:     s/ Michael E. McFarland, Jr.
MICHAEL E. MCFARLAND, JR., #23000
RACHEL K. PLATIN, #58280
Attorneys for Appellants

50

## <u>STATEMENT OF RELATED CASES ON APPEAL</u>

Pursuant to Ninth Circuit Rule 2.8-2.6, Appellants represent that they are not aware of any related cases pending in this Court.

Dated this 21st day of July, 2022.

EVANS, CRAVEN & LACKIE, P.S.

By:     s/ Michael E. McFarland, Jr.
       MICHAEL E. MCFARLAND, JR., #23000
       RACHEL K. PLATIN, #58280
       Attorneys for Appellants