NO. 22-35192

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Randey Thompson,

*Plaintiff-Appellee,*

v.

Ben Small, Keith Clark, Tom Dingus, Debra Long, Cynthia McMullen, and
Mysti Reneau,

*Defendant-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
No. 2:21-cv-00252-SAB
Honorable Stanley A. Bastian

**REPLY BRIEF OF APPELLANTS**

Michael E. McFarland, Jr., WSBA #23000
Rachel K. Platin, WSBA #58280
Evans, Craven & Lackie, P.S.
818 West Riverside, Suite 250
Spokane, Washington 99201
Telephone: (509) 455-5200
*Attorneys for Appellants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………iv

I.    INTRODUCTION……………………………………………………..1

II.    LAW/ARGUMENT………………………………………………………3

    A. This Court Has Jurisdiction to Consider This Appeal………………3

    B. The Denial of Qualified Immunity is Properly on Appeal………….4

    C. There Are No Disputed Facts Precluding Summary Judgment on Qualified Immunity………………………………………………………5

        a. The Individual Defendants Did Not "Disseminate" Mr. Thompson's Facebook Post nor the Individual Defendants Have a Role in the Investigation into Mr. Thompson's Conduct……………………………………………………….5

        b. The Witness and Impact Interviews Were Undisputedly Focused on Mr. Thompson's Derogatory and Violent Language and Not Mr. Thompson's Purported Political Preferences…………………………………………………...8

        c. Mr. Thompson Does Not Dispute That the Individual Defendants Acted Based on the Information Available, nor Does Mr. Thompson Dispute That the Individual Defendants' Actions Were Reasonable in Light of the Available Information…………………………………….15

        d. Mr. Thompson Continues to Fail to Appreciate the Heightened Responsibilities of an Administrator, Further Justifying the Individual Defendants' Actions……………21

III.    CONCLUSION …………………………………………………………25

PROOF OF SERVICE……………………………………………………..27

CERTIFICATE OF COMPLIANCE…………………………………………28

ii

STATEMENT OF RELATED CASES ON APPEAL…………………………..29

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*,
    977 F.3d 530 (6th Cir. 2020) ..................................................................... 13-14

*Berg v. Kincheloe*,
    794 F.2d 457 (9th Cir. 1986) ........................................................................ 6

*Brewster v. Bd. of Educ.*,
    149 F.3d 971 (9th Cir. 1998) ...................................................................... 13

*Estate of Anderson v. Marsh*,
    985 F.3d 726 (2021) ..................................................................................... 3

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) .............................................................................. 11, 13

*Gilbrook v. City of Westminster*,
    177 F.3d 839 (9th Cir. 1999) .................................................................. 13, 14

*Hunter v. Bryant*,
    502 U.S. 224 (1991) .................................................................................. 4, 5

*Isayeva v. Sacramento Sheriff's Dep't.*,
    872 F.3d 938 (9th Cir. 2017) ........................................................................ 4

*Johnson v. Duffy*,
    588 F.2d 740 (9th Cir. 1978) ........................................................................ 5

*Leer v. Murphy*,
    844 F.2d 628 (9th Cir. 1988) ..................................................................... 5-6

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ..................................................................................... 4

*Moonin v. Nev. Ex rel. Its Dep't of Pub. Safety Highway Patrol*,
    960 F. Supp. 2d 1130 (D. Nev. 2013) ........................................................ 14

*Moran v. State of Wash.*,
    147 F.3d 839 (9th Cir. 1998) ...................................................................... 14

iv

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ........................................................................ 4

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) .............................................................. 11, 13

*Rankin v. McPherson*,
    438 U.S. 378 (1987) .............................................................. 12, 13

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ........................................................................ 6

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ........................................................ 17, 18, 22

*Williams v. Bennett*,
    689 F.2d 1370 (11th Cir. 1982) ........................................ 6, 9, 11

*Williams v. Seattle Sch. Dist.*,
    97 Wn.2d 215 (1982) ................................................................. 17

*Wood v. Strickland*,
    420 U.S. 308 (1975) ................................................................... 17

## STATUTES

42 U.S.C. § 1983 ............................................................................. 5

## RULES

Ninth Circuit Rule 2.8-2.6 ............................................................ 29

Ninth Circuit Rule 32 ................................................................... 28

Fed. R. Civ. P. 32 ........................................................................ 28

Fed. R. Civ. P. 36 ........................................................................ 28

# I.  INTRODUCTION

Appellee Randey Thompson argues repeatedly throughout his Answering Brief that Appellants (hereinafter collectively "the Individual Defendants") are not entitled to qualified immunity because the underlying veracity of the allegations against Mr. Thompson is disputed. Mr. Thompson's arguments in that regard are unpersuasive, as they ignore the actual identity of the parties to this appeal (the Individual Defendants and not Central Valley School District), and the actual issue on appeal (the right to qualified immunity). While Mr. Thompson challenges the veracity of the underlying allegations, he does not challenge the reasonableness of the Individual Defendants' reliance upon the information available to them at the time they made their respective decisions. He does not present any evidence that the Individual Defendants had reason to question either the process used to gather the information or the veracity of the information gathered. He does not challenge that the Individual Defendants actually applied the *Pickering* balancing test prior to making their respective decisions. In other words, Mr. Thompson presents no evidence to suggest that the Individual Defendants were not acting in good faith in relying upon the information before them in making their respective decisions.

1

Case law requires public employers contemplating potential adverse employment action arising out of employee speech to perform the *Pickering* balancing test. Consistent with that requirement, CVSD hired an outside investigator to gather the necessary information for the decision makers to perform the *Pickering* balancing test before making any employment decisions about Mr. Thompson. CVSD likewise performed the Impact Interviews specifically designed to assess the potential harm to CVSD arising out of Mr. Thompson's speech. This is <u>exactly</u> what *Pickering* and its progeny require. With this information, Superintendent Ben Small applied the *Pickering* balancing test, weighing the respective interests of Mr. Thompson against those of CVSD. Only after performing the exact analysis required by law, Superintendent Small made the good faith decision to transfer Mr. Thompson to a teaching position. Similarly, the Board members properly applied the information presented them to the *Pickering* balancing test, likewise finding in good faith that CVSD's interests outweighed any competing interests of Mr. Thompson and therefore upholding Superintendent Small's decision.

The Individual Defendants submit that their application of the information presented to them to the *Pickering* balancing test and the

2

resulting conclusions were correct. However, whether or not the *Pickering* balancing test in fact favored CVSD is not the issue. The issue is whether it was patently unreasonable for the Individual Defendants, in applying the *Pickering* balancing test, to conclude that CVSD's interests outweighed those of Mr. Thompson. Case law is clear that when a public employee is required to apply the *Pickering* balancing test, rarely, if ever, will qualified immunity be denied. It is undisputed that the Individual Defendants in fact applied the Pickering balancing test in making their decisions. Mr. Thompson cannot establish that those decisions were patently unreasonable. The Individual Defendants are therefore entitled to qualified immunity.

## II.    LAW AND ARGUMENT

### A.    This Court Has Jurisdiction.

The parties appear to agree that this Court has jurisdiction when "a summary judgment order turns on the application of clearly established law to a given (for appellate purposes undisputed) set of facts." *Estate of Anderson v. Marsh,* 985 F.3d 726, 730-31 (2021). As this appeal is limited to the Individual Defendants' right to qualified immunity, the question of clearly established law properly vests this Court with jurisdiction.

3

**B.      The Issue of Qualified Immunity is Properly on Appeal.**

A government official is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009), *quoting Harlow v. Fitzgerald,* 457 U.S. 900, 818 (1982). The inquiry thus has two steps: "(1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Isayeva v. Sacramento Sheriff's Dep't.,* 872 F.3d 938, 945 (9th Cir. 2017). A court may address either step first. *Pearson,* 555 U.S. at 236. Moreover, since "[t]he entitlement is an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (citations omitted). The Individual Defendants' appeal seeking qualified immunity is properly before this Court.

4

**C.** **The Individual Defendants Are Entitled To Qualified Immunity.**

    **a.** **The Individual Defendants Did Not "Disseminate" Mr. Thompson's Facebook Post nor Did the Individual Defendants Have a Role in the Investigation into Mr. Thompson's Conduct.**

Mr. Thompson argues that "the 'harm' the Individual Defendants attempt to rely upon was completely manufactured by the Individual Defendants in the first place." *Dkt. 24, p. 38.* Specifically, Mr. Thompson argues that his "private Facebook post was disseminated initially **by appellants**." *Id. (emphasis in original).* Yet Mr. Thompson has not identified how the Individual Defendants manufactured harm, or how the Individual Defendants disseminated his Facebook post. In truth, the Individual Defendants did neither. Further, and importantly, Mr. Thompson fails to identify what actions the Individual Defendants did take that deprived him of a constitutional right.

A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complaints]." *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978) (emphasis added). "The inquiry into causation must be individualized and focus on the

duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir. 1988), *citing Rizzo v. Goode,* 423 U.S. 362, 370-71, 375-77 (1976); *Berg v. Kincheloe,* 794 F.2d 457, 460 (9th Cir. 1986); *Williams v. Bennett,* 689 F.2d 1370, 1381 (11th Cir. 1982), *cert. denied.* 464 U.S. 932 (1983). Thus, whether the Individual Defendants are entitled to qualified immunity requires a review each of the Individual Defendant's involvement in the alleged constitutional deprivation.

By Mr. Thompson's own recitation, a fellow CVSD employee first saw Mr. Thompson's "private" Facebook post and then "disseminated it to others who were not co-employees, students, or parents." *Dkt. 24, p. 9.* Mr. Thompson acknowledges that the CVSD employee forwarded the post to other CVSD employees, with the post eventually making its way to Superintendent Small. *Id. p. 9-10.* Whether Mr. Thompson intended his post to be "private" is immaterial, as it is undisputed that the post did not remain "private," but was in fact circulated in the community. Indeed, rarely is anything truly "private" in the age of social media and it was Mr. Thompson who initially "disseminated" his message when he posted on Facebook. *See* (3-ER-297, 310) (Mr. Thompson disseminated his post to his entire friends

list). After Mr. Thompson posted his message, it was further disseminated to, at a minimum, other CVSD employees.[1] Mr. Thompson's assertion that Superintendent Small manufactured the harm and initially disseminated the post ignores the fact that Superintendent Small only received the post because it had already been disseminated in the community.[2] It further ignores the fact that the post was only sent to Superintendent Small because of concern that the derogatory and violent language was contrary to the mission statement of CVSD and could potentially be detrimental to CVSD's relationship with the community it serves. *See* (3-ER-349). The ensuing investigation was undertaken to determine the existence, nature and extent of the harm caused by the dissemination of the post.

Upon receiving complaints about the derogatory and violent language in Mr. Thompson's Facebook post, Superintendent Small directed Assistant Superintendent Jay Rowell to commence an investigation. (2-ER-32; 2:ER-

---

[1] To this day, it is unknown how widely the post was disseminated throughout the CVSD community and beyond. Of course, the unknown extent that the post was disseminated is one of the very reasons CVSD investigated the matter.

[2] Indeed, Mr. Thompson acknowledges that "[o]nly after Mr. Thompson's political Facebook post came to light (through the conduct of others), was Mr. Thompson subjected to the unlawful, pretextual 'investigation' and subsequent demotion." *Response, p. 42*.

57; 3-ER-350-51, 376). As part of the investigation, Mr. Rowell conducted "Impact Interviews" to determine the potential impact of Mr. Thompson's statements, both on Facebook and while working. (2-ER-61). It is simply incorrect that Mr. Rowell "disseminated" Mr. Thompson's post further by asking eight individuals their thoughts on the subject Facebook post without identifying the author of the post. Regardless, whether the same is considered "dissemination" is immaterial to the issue on appeal. What is material is that the individual board members had no role in the impact interviews. In fact, the board members were not provided with the notes from the investigation until *after* Mr. Thompson brought his appeal to the Board. *See* (3-ER-362).

As the individual board members had no role in the impact interviews, or any part of the investigation, there is no question that they cannot be individually liable for any part of the investigation.

> **b.      The Witness and Impact Interviews Focused Solely on Mr. Thompson's Derogatory and Violent Language and Not Mr. Thompson's Purported Political Preferences.**

Mr. Thompson takes issue with Mr. Rowell's "Impact Interviews," arguing that the interviews were "pretextual" and done in an attempt to "effectively 'paper' his employment file with pretextual reasons for

demotion." *Response Brief, p. 38.* Mr. Thompson argues that such "pretextual" acts were done because the Individual Defendants have a personal dispute with his political speech. *Id.* This argument ignores the fact that it is undisputed that the persons interviewed provided the responses/concerns documented by Mr. Rowell. Since the transfer was based, in part, upon the responses/concerns given by the interviewees, and since the substance of the response/concerns is not challenged, the reasons for the transfer simply cannot be identified as "pretextual." Further, and importantly, Mr. Thompson's argument ignores the fact that <u>none</u> of the questions Mr. Rowell asked the interviewees related to politics. Rather, the Impact Interviews focused on Mr. Thompson's use of derogatory and violent language and the potential harm caused to CVSD from the same.

A simple review of the questions asked in the Impact Interviews makes clear that the focus was on Mr. Thompson's derogatory and violent language and its impact (i.e., harm) caused to CVSD. *See* (2-ER-86-120). For example, interviewees were first asked open ended questions such as "what are your initial thoughts" and "what sticks out to you the most about his behavior?" *Id.* In response, interviewees volunteered, "it's beyond insensitive to students with disabilities," (2-ER-87), "Demtard is

particularly bad because it comes from someone working with children, especially special needs children," (2-ER106), "the discriminatory tone-especially the racist and special ed comments," (2-ER-91), "it's very demeaning to certain populations, special ed students, or students of different races," (2-ER-1112), and "profanity and name calling, especially as an administrator, is not ok." (2-ER-117). Likewise, when asked what concerned them the most, interviewees overwhelmingly pointed to the term "Demtard," the phrase about taking someone to the "woodshed" and referring to Michelle Obama a "bitch." (2-ER-86-120). Interviewees explained that "the comment about taking to the woodshed ensues extreme violence." (2-ER-88); *see also* (2-ER-92, 99, 107). One interviewee further explained that "Demtard" was concerning, but "not from a political stand point but the tard part of it." (2-ER-107). Notably absent from the Impact Interviews were <u>any</u> questions about Mr. Thompson's political opinions or political views. It simply cannot be reasonably argued that the derogatory and violent language was not CVSD's sole focus and concern regarding Mr. Thompson's post. CVSD's concern was never about politics.

Likewise, Ms. Allen focused her interviews on how the witnesses came to see Mr. Thompson's Facebook post and why they believed it to be

so concerning. *See* (3-ER-222-247). Specifically, witnesses reported that the "terms used about special needs students" were "hate filled, intolerant and extreme," that the word "Demtards" is "a bad choice for someone who serves children with special needs" and that Mr. Thompson demonstrated a "lack of understanding of how it relates to his professional role – especially the use of the term "tards." *Id.* Ms. Allen then interviewed CVSD employees who worked with Mr. Thompson to determine whether the derogatory and violent language in the post was an anomaly or whether it was reflective of Mr. Thompson's in-school conduct – conduct that is clearly subject to lawful regulation. *Id.; Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006).

Mr. Thompson's argument that the *Pickering* analysis favors his position because there is no evidence that he would have been subject to any adverse employment action absent his Facebook post (*Response, p. 42*) completely ignores the fact that the Impact Interviews were conducted exactly as the *Pickering* analysis contemplates in order to determine the potential harm to CVSD from the post. *See Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting

11

the efficiency of the public services it performs through its employees"). The "pertinent considerations" are whether the statement (a) impairs discipline by superiors or harmony among co-workers; (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise; or (d) undermines the mission of the employer. *Rankin v. McPherson,* 438 U.S. 378, 388 (1987). The Impact Interviews expressly and specifically explored these "pertinent considerations."

It is undisputed that Mr. Thompson's Facebook post was littered with profanity and derogatory and violent words and phrases. Mr. Thompson's post was submitted to Superintendent Small by *other CVSD employees* who were concerned about the language in the post and the message that the post reflected on CVSD. Nonetheless, Mr. Thompson argues that it was "pretextual" and unlawful to interview CVSD employees and community members. But the questions asked in those interviews focused exactly on the information *Pickering* required CVSD to consider: (1) whether the language in the post impairs Mr. Thompson's ability to discipline or maintain harmony with his co-workers; (2) has a detrimental impact on the

close working relationships at CVSD; (3) impedes the performance of Mr. Thompson's duties; (4) interferes with the regular operation of CVSD; (5) or undermines CVSD's mission. These inquiries are not pretextual – they are exactly what *Pickering* demands.

Ms. Allen's witness interviews and Mr. Rowell's Impact Interviews parallel the "pertinent considerations" contemplated in *Rankin* and the "problem" described in *Pickering.* Mr. Thompson's argument that it is "pretextual" and unlawful to perform the <u>exact</u> analysis required by *Rankin* and *Pickering* is simply unpersuasive. Mr. Thompson can offer no legal support for the position that a school district superintendent who receives concerns from employees is constitutionally prohibited from investigating those concerns and then making a decision reasonably based on the outcome of the investigation.

Indeed, public school administrators are not only allowed to conduct such inquiries, but are *encouraged* to do so under a long line of public employee-speech case law. *See e.g., Pickering v. Bd. of Educ., supra*; *Rankin v. McPherson, supra*; *Garcetti v. Ceballos,* 547 U.S. 410; *Brewster v. Bd. of Educ.,* 149 F.3d 971 (9th Cir. 1998); *Gilbrook v. City of Westminster,* 177 F.3d 839 (9th Cir. 1999), *as amended on denial of reh'g*

13

(July 15, 1999); *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.,* 977 F.3d 530 (6th Cir. 2020). Ms. Allen's witness interviews and Mr. Rowell's Impact Interviews were designed to weigh the competing interests contemplated by these cases. As such, CVSD undertook the <u>exact</u> analysis required by *Pickering* and its progeny. As a result of CVSD undertaking the balancing test required by *Pickering*, Superintendent Small is entitled to qualified immunity for his decision to transfer Mr. Thompson absent evidence that it was "patently unreasonable" for him to believe that the *Pickering* balancing test weighed in favor of CVSD. The Board members are likewise entitled to qualified immunity for their decision to uphold Superintendent Small's decision absent evidence that it was patently unreasonable for them to believe that the *Pickering* balancing test performed by CVSD weighed in CVSD's favor. Those are findings that rarely, if ever, can be made when a public agency properly performs the *Pickering* balancing test. *See, Moran v. State of Wash.,* 147 F.3d 839, 847 (9th Cir. 1998); *Gilbrook v. City of Westminster,* 177 F.3d at 867, *citing Brewster,* 149 F.3d at 980; *Moonin v. Nev. Ex rel. Its Dep't of Pub. Safety Highway Patrol,* 960 F. Supp. 2d 1130, 1139-40 (D. Nev. 2013). As such, the Individual Defendants are entitled to qualified immunity.

14

### c. Mr. Thompson Does Not Dispute That the Individual Defendants Acted Based on the Information Available, nor Does Mr. Thompson Dispute That the Individual Defendants' Actions Were Reasonable in Light of the Available Information.

Mr. Thompson's argument that there are disputed facts regarding the veracity of the allegations about his "other conduct" fails to recognize that the veracity of those allegations is irrelevant to the narrow issue on appeal. That is, whether or not Mr. Thompson engaged in the conduct is irrelevant. The relevant inquiry looks at what was presented to Superintendent Small that formed the basis of his decision, and whether or not it was reasonable for him to rely upon that information. Similarly, in determining whether the Board members are entitled to qualified immunity, the inquiry is whether it was reasonable for the Board members to rely upon the information presented to them at the appeal hearing. Mr. Thompson does not address that issue. He provides no evidence or argument that Superintendent Small and/or the Board members had any reason to question the veracity of the information presented to them. Nor does he provide any evidence or argument that Superintendent Small and/or the Board members had reason to question the sufficiency or appropriateness of the process through which the information was obtained. Mr. Thompson further fails to provide any

evidence or argument that Superintendent Small and/or the Board members did not act in good faith in relying upon and acting upon the information presented to them based upon the investigation and interviews performed by Mr. Rowell and Ms. Allen.

Mr. Thompson does not dispute that Superintendent Small and the Board members were presented with information that Mr. Thompson made a post on Facebook that contained violent and derogatory language, that the post was circulated within the CVSD community, was forwarded to Superintendent Small by other CVSD employees and that a sampling of the CVSD community believed the post to be harmful, unprofessional and detrimental to CVSD's mission and purpose. Mr. Thompson further does not dispute that Superintendent Small and the Board members were informed that other CVSD employees and administrators had reported similar in-school language and conduct that caused them concern about Mr. Thompson's effectiveness as an administrator. Finally, Mr. Thompson does not dispute that Superintendent Small and the Board Members were informed that there was reason to believe that Mr. Thompson was uncooperative and untruthful during the investigation.

16

Mr. Thompson's questioning as to the veracity of the above allegations is not a basis for denying qualified immunity to Superintendent Small, as there is no evidence that it was patently unreasonable for him to rely upon the information presented him. Similarly, it is undisputed that the Board members upheld Superintendent Small's decision based upon information they had no reason to believe may not be true. "The board need only 'reconsider' whether the superintendent's decision is 'in the best interests of the school district.'" *Williams v. Seattle Sch. Dist.,* 97 Wn.2d 215, 220 (1982). "Like the initial decision of the superintendent, the board's reconsideration is no more than an exercise of administrative discretion." *Id.* Further, "school board members function at different times in the nature of legislators and adjudicators in the school disciplinary process. Each of these functions necessarily involves the discretion, the weighing of many factors, and the formulation of long-term policy." *Wood v. Strickland,* 420 U.S. 308, 319 (1975), *overruled in part on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800 (1982). "Like legislators and judges, these officers are entitled to rely on traditional sources for the factual information on which they decide and act." *Scheuer v. Rhodes,* 416 U.S. 232, 246 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984).

Upon receipt of Mr. Thompson's post, Superintendent Small's concern was centered on the language used in the post, how widely disseminated the post was and whether Mr. Thompson had made similar posts or used similar language at school. (3-ER-351). Superintendent Small therefore reasonably and appropriately directed that an investigation into those issues ensue. Superintendent Small thereafter did not play a direct role in Mr. Rowell's investigation. *Id.* Rather, after Mr. Rowell conducted Impact Interviews and had Ms. Allen conduct witness interviews, a Notice and Opportunity Meeting was held with Mr. Thompson. *Id.* At the meeting, Mr. Thompson claimed that his Facebook account had been hacked and that he had actually posted a similar, but slightly different message than the one that was ultimately seen. (2-ER-171-175).[3] This claim led to the forensic examination of Mr. Thompson's Facebook account. (2-ER-68-70). The uncooperativeness of Mr. Thompson during the investigation and the lack of any evidence that Mr. Thompson's Facebook account had been hacked led Mr. Rowell to question Mr. Thompson's truthfulness in the investigation. (2-ER-70). Based on Mr. Rowell's investigation and findings,

---

[3] While the allegations of a "hacker" are incredible as previously explained, the language that was the subject of concern (i.e., "Demtard," "woodshed," and "racist bitch") are present in both posts. (2-ER-84 and 2-ER-131).

Superintendent Small decided that Mr. Thompson should be offered a transfer agreement. (3-ER-353). Mr. Thompson declined the transfer agreement and a second Notice and Opportunity Meeting was held to address the new allegations that Mr. Thompson had been dishonest with CVSD in the first meeting. (2-ER-189). Superintendent Small was not present at either meeting. (2-ER-122, 193).

Superintendent Small's ultimate decision to transfer Mr. Thompson was made "based on the recommendation from District administrative staff." (2-ER-203). In evaluating Superintendent Small's decision, it important to note that in addition to the initial employee complaints about the language in the Facebook post, Superintendent Small received information during the investigation that Mr. Thompson, in his role as an administrator in the school district, threatened the working and learning environment and CVSD's stated mission and purpose. Whether or not the witness reports regarding Mr. Thompson's in-school conduct are true, it is undisputed that the witnesses interviewed reported this conduct to Mr. Rowell and Ms. Allen, who in turn reported the same to Superintendent Small. Thus, the information before Superintendent Small was that multiple CVSD administrators reported serious unprofessional conduct by Mr.

19

Thompson. These reports, coupled with the results of the impact interviews, the language in Mr. Thompson's Facebook post and Mr. Rowell's finding that Mr. Thompson was uncooperative and untruthful during the investigation gave Superintendent Small the reasonable belief that he could constitutionally transfer Mr. Thompson to a subordinate teaching position.

To deny Superintendent Small qualified immunity, Mr. Thompson was required to establish that it was patently unreasonable for Superintendent Small to transfer Mr. Thompson to a teaching position after an investigation established employee concerns about Mr. Thompson's derogatory language, including concerns of disharmony among employees, concerns about Mr. Thompson's ability to effectively discipline and lead staff and students, and concerns that Mr. Thompson's conduct reflected poorly on CVSD and was inconsistent with CVSD's stated mission. Mr. Thompson did not establish the same. Mr. Thompson likewise did not establish that it was patently unreasonable for Superintendent Small to have concerns that an administrator in his school district was likely dishonest and uncooperative when questioned about his behavior. CVSD performed the *Pickering* balancing test, weighing the interests of Mr. Thompson against those of CVSD. Based upon that *Pickering* balancing test, Superintendent

Small reasonably believed that it was constitutionally permissible to transfer Mr. Thompson to protect the legitimate interests of CVSD.

The undisputed facts show that Mr. Thompson's transfer was constitutional and legal. Superintendent Small and the Board members acted reasonably and constitutionally when applying the *Pickering* balancing test based upon the information gathered by Mr. Rowell and Ms. Allen. This Court should therefore find that the Individual Defendants are entitled to qualified immunity.

### d. Mr. Thompson Continues to Fail to Appreciate the Heightened Responsibilities of an Administrator, Further Justifying the Individual Defendants' Actions.

Mr. Thompson once again makes the strained argument that his transfer to a teaching position, as opposed to having his employment terminated, demonstrates the lack of legitimate concern by CVSD for his actions. *Dkt. 24, p. 39*. This argument demonstrates Mr. Thompson's continued failure to appreciate the heightened role and standard of an administrator, and further supports the basis for his transfer to a non-administrative position. The truth is, because Mr. Thompson was an administrator, and not a teacher, the interests of CVSD under the *Pickering* balancing test were greater than if he was a teacher.

In the Notice of Transfer, Mr. Thompson was informed, in part, that:

> your response to District concerns about your behavior demonstrates a lack of awareness and insight needed for a school administrator. As a school district administrator who interacts with students, staff, and the public you have a great deal of authority and need for public accountability. As such, your behavior is under greater scrutiny than if you were in a different position.

(2-ER-205).

As an administrator, Mr. Thompson was tasked with leading, and (when necessary) disciplining his subordinate staff. Mr. Thompson was also tasked with serving, and (when necessary) disciplining students. These are tasks that require a great deal of responsibility and judgment. These tasks also require staff and students to trust Mr. Thompson. As an administrator, Mr. Thompson was a face of CVSD, and as an administrator, Mr. Thompson's words and conduct can be attributed to CVSD. As such, when conducting the *Pickering* balancing test, the interests of CVSD are significantly higher than if Mr. Thompson had been a teacher.

As an administrator, Mr. Thompson's conduct could be attributed to CVSD in ways that a teacher's conduct would not. Indeed, when a CVSD employee saw Mr. Thompson's derogatory Facebook post, she forwarded it to another CVSD employee, who in turn forwarded it to more CVSD

22

employees. (2-ER-56; 3-ER-223-225). It was then forwarded to Superintendent Small. *Id.* This occurred not merely because the post was derogatory and offensive, but because Mr. Thompson is a CVSD administrator and easily identified as such. Indeed, a non-CVSD employee even commented on Mr. Thompson's post ("CV VP OK?"), further showing that Mr. Thompson was recognized as a CVSD administrator by those outside of CVSD. (3-ER-238). The employees who forwarded the post reported that the statement was concerning specifically because it came from an administrator. *See e.g.,* (3-ER-237) ("concerned someone in our administration would say that"); (3-ER-240) ("lots of obviously concerning statements. Mainly, it was the tone of it for a middle school administrator in particular"); (3-ER-241) ("not appropriate for an administrator of this district"); (3-ER-242) ("felt the lack of understanding of how it relates to his professional role – especially the use of the term "tards" by an administrator"). It was the very nature of Mr. Thompson's position as a leader in CVSD that resulted in the harm from his conduct.

Administrators lead. They have the authority to discipline subordinate employees. They have the authority to discipline students. They serve as role models for acceptable behavior of their subordinates. They

serve as role models for students. They are visible to the community they serve. They are often, in the eyes of the community, the embodiment of the school and school district in which they are employed.

With that authority comes a heightened need for the employer school district to assure that the administrator is not engaged in conduct that harms the school district's relationship with its staff, students and community. Stated simply, the greater the authority of the employee, the greater the potential harm the employee can cause through his or her acts or speech. Mr. Thompson's failure to recognize that the harm potentially caused to the community, staff and students by his conduct can be exponentially different and greater than the same conduct from a teacher shows exactly why Superintendent Small, applying the *Pickering* balancing test, was reasonable in transferring Mr. Thompson to a teaching position. Mr. Thompson's derogatory Facebook post contained stigmatizing epithets potentially harmful to the special needs students served by CVSD. The use of that language ("tard") in his Facebook post is contrary and detrimental to CVSD's core purpose to effectively serve and educate *all* students. The derogatory language ran directly contrary to CVSD's Recommitment to Equity and Inclusion – an important CVSD resolution to ensure a safe and

supportive school and work environment for all students, staff, families and community members. Publicly espousing such hateful and derogatory language as an administrator causes justifiable concern in itself. The potential harm to students, to CVSD's relationship with its community, to Mr. Thompson's ability to effectively lead and to CVSD's mission statement were all considered in performing the *Pickering* balancing test. The fact that the balancing test may have had different results had Mr. Thompson been a teacher is immaterial. And the fact that CVSD did not terminate Mr. Thompson's employment only establishes a thoughtful, deliberate evaluation whereby CVSD took only the measures necessary to address the potential harm caused by having an administrator engaging in the conduct in question. Qualified immunity is proper.

## III. CONCLUSION

For the reasons explained in the Opening Brief and herein on reply, the Individual Defendants are entitled to qualified immunity. The district court's order denying summary judgment on this basis should be reversed.

Dated this 28th day of November, 2022.

EVANS, CRAVEN & LACKIE, P.S.

By: _____ s/ *Michael E. McFarland, Jr.* _____
     MICHAEL E. MCFARLAND, JR., #23000
     RACHEL K. PLATIN, #58280
     Attorneys for Appellants

## <u>PROOF OF SERVICE AND CERTIFICATE OF COMPLIANCE</u>

I hereby certify that on this 28 day of November 2022, I electronically filed the foregoing Reply Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system which will send notification to the following:

### <u>COUNSEL FOR APPELLEE</u>

Michael B. Love
Michael Love Law, PLLC
905 W. Riverside Ave., Suite 404
Spokane, WA 99201
Email:      mike@michaellovelaw.com

Robert F. Greer
Megan Clark
Etter, McMahon, Lamberson,
   Van Wert & Oreskovich, P.C.
618 W. Riverside, Suite 210
Spokane, WA 99201
Email:      robg@ettermcmahon.com
Email:      mclark@ettermcmahon.com

Dated this 28th day of November, 2022.

EVANS, CRAVEN & LACKIE, P.S.

By:      _____s/ *Michael E. McFarland, Jr.*_____
MICHAEL E. MCFARLAND, JR., #23000
RACHEL K. PLATIN, #58280
Attorneys for Appellants

27

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  Pursuant to Ninth Circuit Rule 32(e)(4), I certify that the Appellant's Reply Brief has 4,984  words and is in compliance with Rule 32(a)(7)(B).

2.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and the type of style requirements of Fed. R. App. 36(a)(6) because it has been prepared in a proportionally spaced serif typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated this 28th day of November, 2022.

EVANS, CRAVEN & LACKIE, P.S.

By:  _____ s/ *Michael E. McFarland, Jr.*  ____
MICHAEL E. MCFARLAND, JR., #23000
RACHEL K. PLATIN, #58280
Attorneys for Appellants

## <u>STATEMENT OF RELATED CASES ON APPEAL</u>

Pursuant to Ninth Circuit Rule 2.8-2.6, Appellants represent that they are not aware of any related cases pending in this Court.

Dated this 28th day of November, 2022.

EVANS, CRAVEN & LACKIE, P.S.

By: _____s/ *Michael E. McFarland, Jr.*_____
MICHAEL E. MCFARLAND, JR., #23000
RACHEL K. PLATIN, #58280
Attorneys for Appellants